**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**MARGARET L. BRUMMETT,**
o/b/o **L.R.,**

                           **Plaintiff,**                 5:10-cv-384
                                                            (GLS)
              **v.**

**MICHAEL ASTRUE,** Commissioner of
Social Security**,**
                           **Defendant.**
_____

**APPEARANCES:**                           **OF COUNSEL:**

**FOR THE PLAINTIFF:**
Olinsky Law Group                      HOWARD D. OLINSKY, ESQ.
300 S. State Street
5th Floor, Suite 520
Syracuse, NY 13202

**FOR THE DEFENDANT:**
HON. RICHARD S. HARTUNIAN     SOMMATTIE RAMRUP
United States Attorney                TRACY UDELL
100 South Clinton Street             ELLEN E. SOVERN
Syracuse, NY 13261                  Special Assistant U.S. Attorneys

Mary Ann Sloan
Regional Chief Counsel
Social Security Administration
Office of General Counsel, Region II
26 Federal Plaza, Room 3904
New York, NY 10278

**Gary L. Sharpe**
**Chief Judge**

**MEMORANDUM-DECISION AND ORDER**

## I. **Introduction**

Plaintiff Margaret L. Brummett o/b/o L.R. ("LR"), challenges the Commissioner of Social Security's denial of Supplemental Security Income ("SSI"), seeking judicial review under 42 U.S.C. §§ 405(g) and 1383(c)(3). (*See* Compl., Dkt. No. 1.) After reviewing the administrative record and carefully considering the arguments, the Commissioner's decision is reversed and remanded.

## II. **Background**

On October 23, 2006, Brummett protectively filed an application for SSI under the Social Security Act ("Act"), alleging disability since May 23, 2006. (Tr.[1] at 94-96.) After her application was denied, Brummett requested a hearing before an Administrative Law Judge (ALJ), which was held on February 19, 2009. (*Id.* at 21.) On April 24, 2009, the ALJ issued a decision denying the requested benefits, which became the Commissioner's final decision upon the Social Security Administration Appeals Council's denial of review. (*Id.* at 1-3, 5-7.)

Brummett commenced the present action by filing a complaint on

---

[1] "(Tr. )" refers to the page of the Administrative Transcript in this case. (See Dkt. No. 8.)

2

April 1, 2010, seeking review of the Commissioner's determination. (Compl., Dkt. No. 1.) The Commissioner filed an answer and a certified copy of the administrative transcript. (Dkt. Nos. 7-8.) Each party, seeking judgment on the pleadings, filed a brief. (Dkt. Nos. 11, 13.)

### III. Contentions

Brummett contends that the Commissioner's decision is not supported by substantial evidence and was arrived at through the application of incorrect legal standards. (Dkt. No. 11 at 1.) Specifically, Brummett claims that: (1) the ALJ erred when he found that LR's only "severe impairments" were borderline intellectual functioning and language delay; (2) LR's impairments meet Listings 112.02, 112.05(C) and/or 112.05(D); (3) even if LR's impairments do not meet a Listing, they should be found to be functionally equivalent to the Listings; and (4) the ALJ applied an incorrect legal standard in evaluating Brummett's testimony. (*Id.*) The Commissioner counters that the appropriate legal standards were applied by the ALJ, and that his decision is supported by substantial evidence. (*See generally* Dkt. No. 13.)

### IV. Facts

The evidence in this case is undisputed and the court adopts the

3

parties' factual recitations.  (*See* Dkt. No. 11 at 2-11; Dkt. No. 13 at 1-2.)

## V. Standard of Review

The standard for reviewing the Commissioner's final decision under 42 U.S.C. § 405(g) is well established and will not be repeated here.  For a full discussion of the standard of review, the court refers the parties to its previous opinion in *Christiana v. Comm'r of Soc. Sec. Admin.*, No. 1:05-CV-932, 2008 WL 759076, at *1-2 (N.D.N.Y. Mar. 19, 2008).

## VI. Discussion

### A. Child Disability Determination

The Social Security Administration has established a three-step evaluation process by which to determine whether individuals under the age of 18 are disabled.  20 C.F.R. § 416.924(a).  The first inquiry is whether the child is engaging in substantial gainful activity.  *Id.*  If so, the child is determined not to be disabled, and the inquiry ends.  *Id.*  If the child is not engaging in substantial gainful activity, the ALJ must determine whether the child has "an impairment or combination of impairments that is severe."  *Id.*  An impairment is not severe if it is merely a "slight abnormality . . . that causes no more than minimal functional limitations."  *Id.* at § 416.924(c).  If the ALJ finds in the negative, a determination of non-

disability is made, and the analysis goes no further.  *Id.*  Where a severe impairment or combination of impairments exists, however, the final inquiry is whether the child's impairment or combination of impairments "meets, medically equals, or functionally equals the listings."  *Id.* at § 416.924(a).  If the child has such an impairment or combination of impairments, and the duration requirement is met, a finding of disability is made.  *Id.*

## B.   Severe Impairments

Brummett contends first that the ALJ erred in his determination that LR's only severe impairments were borderline intellectual functioning and language delay.  (Dkt. No. 11 at 1.)  She argues that the following impairments should also have been deemed severe: mental retardation; separation anxiety disorder; disruptive behavior disorder; schizoaffective disorder; obsessive-compulsive disorder; and enuresis.  (Dkt. No. 11 at 13-16.)  The ALJ's severity determinations, however, are supported by substantial evidence and will therefore not be disturbed.

### 1.   Mental Retardation

Brummett argues that the ALJ substituted his own opinion for that of the medical evidence in the record when he determined that LR was not mentally retarded.  (Dkt. No. 11 at 14.)  In a November 2, 2006 consultative

5

psychiatric examination and intelligence evaluation, Psychologist Jeanne A. Shapiro administered to LR a WISC-IV IQ test. (Tr. at 295.) LR's scores ranged from a 67 in Perceptual Reasoning to an 88 in Working Memory, with a Full Scale IQ score of 70. (*Id.*) Dr. Shapiro determined that LR was "functioning in the high mild range of mental retardation" and diagnosed her with "mild mental retardation." (*Id.* at 291, 295.)

As the ALJ noted, however, all other examiners on record determined LR to be in the borderline intellectual functioning range. (*Id.* at 12.) In June 2004, School Psychologist Robert Magee administered to LR a WISC-III IQ test, on which she obtained a Full Scale IQ score of 77.[2] (*Id.* at 263.) In light of a considerable disparity in LR's Verbal and Performance scores, Magee determined that "[LR]'s obtained Verbal I.Q. score of 88 . . . would be considered the most appropriate predictor of potential." (*Id.* at 264.) During a May 2007 Psychological Evaluation administered by the Oswego City School District, LR registered a Full Scale score of 58 on a

---

[2] Brummett argues that the 2004 I.Q. test should not have been considered by the ALJ because 20 C.F.R. pt. 404, subpt. P, app. 1 § 112.00(D)(10) limits the validity of IQ tests obtained between ages 7 and 16 to two years when the score is 40 or above. (Dkt. No. 11 at 19.) Because Brummett alleges disability beginning on May 23, 2006, however, the June 11, 2004 test was clearly current as of the date of application. *See LaRock ex rel. M.K. v. Astrue*, No. 10-CV-1019, 2011 WL 1882292, at *5 (N.D.N.Y. Apr. 29, 2011) (holding that the operative date in evaluating qualification for benefits is that of application).

6

WISC-IV IQ test.  (*Id.* at 216.)  While this score would place LR in the "low extreme range of cognitive ability," the report explicitly noted that because LR's "composite scores demonstrated a significant degree of variation," the "Full Scale composite score[] [was] likely [an] inaccurate representation[] of [her] abilities, and should be interpreted with caution."  (*Id.* at 216-17.)  Instead, School Psychologist John M.Garruto determined that LR's "overall cognitive skills are in the borderline to below average range."  (*Id.* at 222.)  Furthermore, in a March 5, 2007 Childhood Disability Evaluation, Psychologist M. Morog indicated that LR had "borderline [IQ] scores."  (*Id.* at 312.)  Lastly, in four separate reports between July 2006 and October 2008, attending Dr. Mihai Simionescu diagnosed LR as suffering from borderline intellectual functioning.  (*Id.* at 277-80.)  Accordingly, the ALJ permissibly determined that a finding of severe impairment based on mild mental retardation was not supported by the weight of the evidence in the record.

    2.    <u>Remaining Impairments</u>

In addition to mental retardation, Brummett argues that the ALJ erred in failing to classify the following impairments as severe: separation anxiety disorder; disruptive behavior disorder; schizoaffective disorder; obsessive-

7

compulsive disorder; and enuresis. (Dkt. No. 11 at 14-16.) Together, Drs. Shapiro and Simionescu diagnosed LR with each of these disorders. (Tr. at 277-80, 288-98.) The ALJ discounted the severity of these diagnoses, however, because he determined that they were "not borne out substantially throughout the remainder of the relatively extensive case file." (*Id.* at 12.) Specifically, the ALJ found the opinions of Drs. Shapiro and Simionescu to be based largely on the "clinically unsupported assertions" of LR's mother, and in conflict with multiple evaluations performed by school officials, whom the ALJ felt had "presumably considerably more experience on a day-to-day basis of [LR]'s actual character and behavior." (*Id.*)

Typically, as the ALJ notes, the treating physician rule "requires deference to the medical opinion of a claimant's treating physician." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); (Tr. at 12.) This deference gives way, however, where "the treating physician issue[s] opinions that are not consistent with other substantial evidence in the record." *Halloran*, 362 F.3d at 32. Because the record contains numerous educational reports—discussed at greater length below—which portray LR as a relatively well-adjusted student, ALJ Flanagan's determination not to

8

classify LR's impairments of separation anxiety disorder, disruptive behavior disorder, schizoaffective disorder, obsessive-compulsive disorder, and enuresis as severe is supported by substantial evidence. (*See, e.g.*, Tr. at 127-33, 147-48, 186-88, 204, 235-43, 264, 266.)

## C. Listings

Brummett argues next that the ALJ erroneously failed to analyze Listings 112.02 and 112.05(D), and that his determination that LR did not meet Listing 112.05(C) was not supported by substantial evidence.[3] (*See* Dkt. No. 11 at 16-20.) The ALJ's determination that LR did not qualify for Listing 112.05(C), along with his decision to omit analysis of Listing 112.02, are supported by substantial evidence in the record. His failure to address Listing 112.05(D), however, requires remand.

### 1. Listing 112.02

For a claimant to meet Listing 112.02, "Organic Mental Disorders," she must show that "history and physical examination or laboratory tests . .

---

[3] While Brummett alleges that the ALJ considered only Listing 112.05(C), his decision discusses "Listing 112.05(D)." (Tr. at 13.) In discussing Listing 112.05(D), however, the ALJ notes exclusively language regarding LR's sub-60 IQ test. (*Id.*) Because the ALJ's analysis is limited to factors relevant to Listing 112.05(C), his determination will be construed as dealing with that listing, and his decision will be deemed devoid of any consideration of Listing 112.05(D). In the unlikely event that the ALJ was in fact considering Listing 112.05(D) as stated, his analysis was plainly insufficient as it contained no mention of LR's multiple IQ scores in the 60-70 range, nor any facts relevant to prong two of the Listing.

9

. demonstrate or support the presence of an organic factor judged to be etiologically related to the abnormal mental state." 20 C.F.R. pt. 404, subpt. P, app. 1 § 112.02.  The requisite level of severity for children ages 3 to 18 is met where, *inter alia*, the disorder resulted in two of the following: "(a) [m]arked impairment in age-appropriate cognitive/communicative function . . . ; or (b) [m]arked impairment in age-appropriate social functioning . . . ; or (c) [m]arked impairment in age-appropriate personal functioning . . . ; or (d) [m]arked difficulties in maintaining concentration, persistence, or pace.  *Id.* at § 112.02(B)(2)(a)-(d).  In his functional equivalency assessment—explored more fully below—the ALJ permissibly found that the only domain in which LR was markedly limited was "Acquiring and Using Information."  (Tr. at 14-18.)  Because such a determination precludes a finding that LR met Listing 112.02, the ALJ did not err in failing to explicitly analyze LR's qualification under that Listing.  *See Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998) ("Where application of the correct legal standard could lead to only one conclusion, we need not remand." (citation omitted)).

    2.    <u>Listings 112.05(C) and (D)</u>

To meet Listing 112.05—"Mental Retardation"—the claimant must

have an impairment "[c]haractized by significantly subaverage general intellectual functioning with deficits in adaptive functioning," and must satisfy one of the Listing's six subparts. 20 C.F.R. pt. 404, subpt. P, app. 1 § 112.05; *Juckett ex rel. K.J. v. Astrue*, No. 09-CV-708, 2011 WL 4056053, at *5 (N.D.N.Y. June 29, 2011). In order to meet Listing 112.05(C), the claimant must have "[a] valid verbal, performance, or full scale IQ of 59 or less." *Id.* at § 112.05(C).

As noted above, LR's Full Scale score of 58 on a May 2007 WISC-IV IQ test—her only sub-60 score—was deemed by School Psychologist Garruto to likely be an "inaccurate representation[] of [LR]'s abilities, and should be interpreted with caution." (Tr. at 216-17.) The ALJ made clear that, in light of Garruto's warning and LR's higher IQ scores from 2004, he found the 2007 IQ test to be unreliable. (*Id.* at 12-13.) It is within the purview of an ALJ to "reject an IQ score as invalid when it is inconsistent with the record." *Juckett*, 2011 WL 4056053, at *7; *Edwards v. Astrue*, No. 5:07-CV-898, 2010 WL 3701776, at *5 (N.D.N.Y. Sept. 16, 2010). The ALJ's determination that LR's lone sub-60 IQ score was unreliable, and therefore LR did not meet Listing 112.05(C), is supported by substantial evidence in the record.

11

Listing 112.05(D) requires "[a] valid verbal, performance or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function." 20 C.F.R. pt. 404, subpt. P, app. 1 § 112.05(D). LR attained at least four IQ scores in the 60 through 70 range: in 2004, a Performance score of 70; in 2006, a Perceptual Reasoning score of 67 and a Full Scale score of 70; and in 2007, a Verbal Comprehension score of 67. (Tr. at 263-64, 295, 217.) Despite multiple scores in the 60 through 70 range, the ALJ did not analyze Listing 112.05(D). (*Id.* at 13.); (*See supra* note 3.) While the ALJ clearly did not believe that the record as a whole supported Dr. Shapiro's diagnosis of mild mental retardation (*see id.* at 11-13), he failed to specifically address either prong of Listing 112.05(D), "and [the] [c]ourt is not permitted to accept the Commissioner's post-hoc rationalization in this regard." *Martinbeault v. Astrue*, No. 1:07-CV-1297, 2009 WL 5030789, at *6 (N.D.N.Y. Dec. 14, 2009). This lack of explanation by the ALJ renders it impossible to determine whether he applied the appropriate legal standard. *Id.* "[W]here there is reasonable basis for doubting whether the Commissioner applied the appropriate legal standards, even if the ultimate decision may be arguably supported by substantial evidence, the

12

Commissioner's decision may not be affirmed." *Swanson ex rel. J.M.C.S. v. Astrue*, No. 5:06-CV-97, 2009 WL 1362959, at *4 (N.D.N.Y. May 13, 2009) (quoting *Martone v. Apfel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999)). Accordingly, remand for the limited purpose of determining whether LR's impairments meet or medically equal Listing 112.05(D) is appropriate. *See Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999).

### D.  Functional Equivalency

If a claimant's impairments do not meet or medically equal an impairment included in the Listings, "the Commissioner must still determine whether the impairment or combination of impairments are functionally equivalent to a Listing." *Martinbeault*, 2009 WL 5030789, at *7; *see also* 20 C.F.R. § 416.926a.  A finding of functional equivalence requires "marked" limitations in two, or an "extreme" limitation[4] in one, of the following six "domains": "(i) [a]cquiring and using information; (ii) [a]ttending and completing tasks; (iii) [i]nteracting and relating with others; (iv) [m]oving about and manipulating objects; (v) [c]aring for yourself; and (vi) [h]ealth and physical well-being." 20 C.F.R. § 416.926a(a), (b)(1)(i)-(vi).  All of the

---

[4] A "marked" limitation is one that "interferes seriously" with the claimant's "ability to independently initiate, sustain, or complete activities" within the given domain, while an "extreme" limitation "interferes very seriously" with those abilities.  20 C.F.R. § 416.926a(e)(2)(i), (3)(i).

13

claimants impairments, severe or otherwise, are considered in a functional equivalency analysis. *Id.* at § 416.926a(a). The ALJ found that LR's only marked limitation was in "acquiring and using information." (Tr. at 15.)

Brummett argues that the ALJ erred in failing to also find marked limitations in "attending and completing tasks," "interacting and relating with others," and "caring for self." (Dkt. No. 11 at 21-23.) The ALJ's functional equivalency analysis, however, is supported by substantial evidence and will not be disturbed.

### 1. Attending and Completing Tasks

This domain contemplates a child's ability to focus and maintain attention, "begin, carry through, and finish . . . activities, including the pace at which [she] perform[s] activities and the ease with which [she] change[s] them." 20 C.F.R. § 416.926a(h). The ALJ found that LR had less than marked limitation in this domain, reasoning that despite teacher reports indicating "quite serious difficulties with class work organization and assignment completion," the overall evidence suggested that LR "function[s] well in terms of paying attention, focusing, taking turns, responding without distracting others, and working at a reasonable pace."

14

(Tr. at 15.) Brummett contends that a finding of marked limitation was appropriate in light of determinations by Dr. Simionescu and LR's eighth grade teacher that, within this domain, LR displayed some "serious" and "very serious" problems, respectively. (Dkt. No. 11 at 21.) This argument is contradicted by substantial evidence in the record.

In February 2007, LR's sixth grade teacher reported that LR had no problems in this domain. (*Id.* at 129.) Dr. Morog reached the same conclusion in March 2007. (*Id.* at 308-09.) In a June 2004 Confidential Triennial Reassessment, School Psychologist Magee noted that LR's "[a]ttention and concentration, in the one-on-one test setting, was within age-appropriate limits." (*Id.* at 264.) Lastly, in a November 2006 psychiatric examination, Dr. Shapiro determined that LR's "attention and concentration [were] intact." (*Id.* at 290.) Thus, while LR undoubtedly has some problems within this domain, the ALJ's determination of less than marked limitation is supported by substantial evidence in the record.

  2. <u>Interacting and Relating with Others</u>

In considering this domain, the Commissioner weighs a claimant's ability to "initiate and sustain emotional connections with others, develop and use the language of [her] community, cooperate with others, comply

15

with rules, respond to criticism, and respect and take care of the possessions of others." 20 C.F.R. § 416.926a(i). The ALJ found that LR had less than marked limitation in this domain, noting that despite some expressive language delays, "teacher reports overall show that limitations are relatively slight." (Tr. at 16.) Brummett again relies on the opinions of Dr. Simionescu and LR's eighth grade teacher in arguing that the ALJ's determination is not supported by substantial evidence. (Dkt. No. 11 at 22.) Again, this contention fails.

In fact, Dr. Simionescu appears to be alone in his opinion that LR suffered serious problems in this domain. (*Id.* at 316.) LR's eighth grade teacher, to whom Brummett cites for support, actually describes LR's problems in this domain as "slight." (*Id.* at 239.) In sixth grade, LR was found to have no problem in this domain, and she was described by her teacher as a "very loving and compassionate child." (*Id.* at 130.) Furthermore, LR's 2003-2004 and 2005-2006 Individualized Education Programs ("IEP") both note that LR has friends and "enjoys the social parts of the day." (*Id.* at 187, 266.) The latter IEP elaborated that LR "is friendly with adults and enjoys being a helper." (*Id.* at 266.) A 2007 psychological evaluation described LR as having a "friendly nature" and "demonstrated

16

ability to interact appropriately in the classroom." (*Id.* at 221.) Finally, in March 2007, Dr. Morog opined that LR had "less than marked" limitations in this domain. (*Id.* at 309.) In light of this lopsided evidence, the ALJ's determination as to this domain is clearly supported by substantial evidence.

### 3. Caring for Self

This domain contemplates a claimant's ability to "maintain a healthy emotional and physical state." 20 C.F.R. § 416.926a(k). This includes how well the claimant gets her "physical and emotional wants and needs met in appropriate ways; how [she] cope[s] with stress and changes in [her] environment; and whether [she] take[s] care of [her] own health, possessions, and living area." *Id.* Noting that the opinion of LR's eighth grade teacher that LR had no obvious or serious problems in this domain was "reasonably in consonance with the rest of the case file," the ALJ found less than marked limitations in this domain. (Tr. at 17-18.) Brummett again relies unpersuasively on the opinion of Dr. Simionescu for the proposition that LR had marked or extreme limitations in this domain. (Dkt. No. 11 at 22.)

As noted by the ALJ, LR's eighth grade teacher found only "slight"

17

problems in this domain. (Tr. at 241.) Additionally, Dr. Morog found that LR's limitations in this domain were "less than marked." (Tr. at 310.) While the ALJ admits that if the testimony of LR's mother was given full weight, LR would have marked or extreme limitations in this domain, that testimony was permissibly discredited by the ALJ, as discussed below. (Tr. at 14, 18.) Thus, the ALJ's determination that LR suffered less than marked limitations in this domain is supported by substantial evidence.

### E.     Testimony of LR's Mother

Brummett contends finally that the ALJ failed to apply the appropriate legal standard or provide appropriate reasoning in determining that the testimony of LR's mother lacked credibility. (Dkt. No. 11 at 23-24.) Neither argument, however, is persuasive.

Once an ALJ finds the existence of a "medically determinable impairment(s) that could reasonably be expected to produce" the symptoms alleged, he must then "evaluate the intensity and persistence" of those symptoms in order to determine the claimant's capacity for functioning. 20 C.F.R. § 416.929(c)(1). "[T]o the extent that the claimant's . . . contentions are not substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry." *Meadors v. Astrue*, 370 F.

18

App'x 179, 183-84 (2d Cir. 2010) (citation omitted). That determination "must contain specific reasons for the finding on credibility . . . and must be sufficiently specific to make clear" the weight afforded "and the reasons for that weight." SSR 96-7p, 61 Fed. Reg. 34483, 34484 (July 2, 1996).

The ALJ clearly stated that LR's "medically determinable impairments could reasonably be expected to produce some of the alleged symptoms," thereby satisfying step one of the two-part inquiry. (Tr. at 14.) Next, the ALJ determined that the testimony of LR's mother alleging serious behavioral problems was not credible in light of extensive contradictory findings by school authorities and "attending classroom teachers." (*Id.* at 13.) The ALJ also noted that the credibility of LR's mother was further undermined by her lack of compliance with Dr. Simionescu's treatment regimen. (*Id.* at 14.) Accordingly, the ALJ both applied the appropriate legal standard and provided sufficient reasoning to substantiate his determination that the testimony of LR's mother was not credible

## VII. Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that the decision of the Commissioner is **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g), for the

limited purpose of determining whether LR's impairments meet or medically equal Listing 112.05(D); and it is further

**ORDERED** that the Clerk close this case and provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

February 10, 2012
Albany, New York

_____
Gary L. Sharpe
Chief Judge
U.S. District Court